[No. 25272-4-II. Division Two. April 19, 2002.]

THE STATE OF WASHINGTON, *on the relation of* EVERGREEN FREEDOM FOUNDATION, ET AL., *Appellants*, v. WASHINGTON EDUCATION ASSOCIATION, ET AL., *Respondents*.

---

588

590

*Jeanne A. Brown* (of *Evergreen Freedom Foundation*) and *Steven T. O'Ban* and *Nathaniel L. Taylor* (of *Ellis, Li & McKinstry, P.L.L.C.*), for appellants.

*Judith A. Lonnquist* (of *Law Offices of Judith A. Lonnquist, P.S.*), *Harriet K. Strasberg*, and *Catherine Coyne O'Toole*, for respondents.

*James R. Spady* on behalf of Education Excellence Coalition, amicus curiae.

*Christine O. Gregoire, Attorney General*, and *Nancy J. Krier, Assistant*, on behalf of Public Disclosure Commission, amicus curiae.

HOUGHTON, J. — The Washington Education Association (WEA) conducted a campaign opposing two statewide initiatives in the 1996 general election. The initiatives did not pass. The Evergreen Freedom Foundation (EFF) filed a lawsuit against WEA, alleging that WEA was a political committee and, therefore, it did not make the appropriate financial disclosures regarding its opposition to the initiatives. At trial, WEA asserted that the definition of "political committee" was unconstitutional because it chilled WEA's First Amendment right to issue advocacy. The trial court

found that WEA was not a political committee and did not reach any constitutional issues. EFF appeals the trial court's ruling, arguing that (1) WEA was a political committee; (2) EFF was entitled to a jury trial; (3) EFF was entitled to amend its complaint to include additional allegations; and (3) the trial court erred in awarding attorney fees to one defendant. WEA cross-appeals, arguing, inter alia, that the statutory definition of "political committee" is unconstitutional and the trial court erred in not awarding it attorney fees.[1] We agree with the trial court that the WEA was not a political committee and, therefore, we affirm.

## FACTS

Two initiatives on the ballot for the November 1996 election, I-173 and I-177 (I-173/177), would have allowed charter schools and the use of education vouchers. The WEA, a labor union representing employees in public schools, opposed both initiatives.

During the 1996 election cycle,[2] WEA informed its members about I-173/177 and organized opposition to the initiatives. WEA also formed a separate political committee, the "No on I-173/177 Committee" (the No Committee), with other organizations opposed to the initiatives. WEA contributed $263,500 in general fund cash and in-kind contributions to the No Committee.

WEA also solicited the National Education Association (NEA) for funds to donate to the No Committee. The NEA transferred $410,000 to WEA, which donated the money to the No Committee.

---

[1] The Attorney General submitted an amicus curiae brief defending the constitutionality of the definition of "political committee" in RCW 42.17.020(33) and arguing that the trial court properly declined to allow EFF to amend its complaint during trial. The Education Excellence Coalition also submitted an amicus curiae brief arguing that a factor the trial court used in concluding that WEA was not a political committee violated the Equal Protection Clause of the Constitution.

[2] The trial court ruled that for the purpose of this case, the 1996 election cycle was from July 1, 1995, to November 6, 1996.

The initiatives did not pass. In April 1997, EFF took the first steps toward filing a citizen's lawsuit under RCW 42.17.400(4) by filing an administrative complaint with the Washington Attorney General's Office (AG), as required by the public disclosure act (the Act). EFF then would be free to file a citizen's lawsuit on the issues that either the Public Disclosure Commission (PDC) or the AG did not act on. EFF complained that WEA had violated various provisions of the Act. The PDC acted on some of these allegations and declined to act on others.[3]

In fall 1997, EFF learned that WEA had also received $410,000 from NEA in order to assist it in defeating I-173/177.[4] EFF believed this also violated the Act.[5]

EFF sought to include these new allegations in its citizen's lawsuit against WEA. According to the Act, EFF had to pursue administrative remedies first. On October 1,

---

[3] The AG filed an enforcement action against WEA (*Wash. Educ. Ass'n v. State*, No. 96-2-04395-5 (Thurston County Super. Ct. May 5, 1997)). WEA; James Seibert, WEA's executive director; and Kristeen Hanselman, an NEA employee, filed a counterclaim (*Wash. Educ. Ass'n v. Public Disclosure Comm'n*, No. 97-2-02700-1 (Thurston County Super. Ct. Mar 3, 1998)). The Public Disclosure Commission filed an administrative action against WEA involving a transfer of $410,000 (discussed below). *In re Seibert*, No. 98-176, Pub. Disclosure Comm'n Findings of Fact, Conclusions of Law and Order (Feb. 23, 1998).

On February 26, 1998, all parties entered into a settlement agreement in which they agreed, inter alia, that WEA would change its policies to disallow money for political education of its members (Community Outreach Program or COP) to be used to pay for administrative or overhead expenses for WEA's registered political action committee (WEA-PAC); COP was not and is not a political committee within the meaning of RCW 42.17.020(33); WEA-PAC unintentionally failed to report in-kind contributions for administrative support from funds allocated to COP; WEA unintentionally failed to report legal contributions to WEA-PAC and the No Committee to the PDC; WEA, its UniServ Councils, local associations and WEA-PAC are affiliated entities for purposes of sharing contribution limits but separate entities for purposes of reporting contributions; WEA violated RCW 42.17.120 by submitting $410,000 to the No Committee without disclosing NEA as the source of those funds (discussed below); NEA violated RCW 42.17.120 by giving $410,000 to WEA to give the No Committee without reporting separately to the PDC. WEA and its affiliates agreed to pay a $80,000 penalty and $20,000 in costs to the state. Finally, the above mentioned lawsuits and administrative charges and pending complaints were dismissed with prejudice.

[4] *See* n.3, *supra.*

[5] The statute in question, RCW 42.17.120, reads: "No contribution shall be made and no expenditure shall be incurred, directly or indirectly, in a fictitious name, anonymously, or by one person through an agent, relative, or other person in such a manner as to conceal the identity of the source of the contribution or in any other manner so as to effect concealment."

1997, EFF sent a first notice to the AG requesting that the state file a lawsuit against WEA because of the funds transfer from NEA to WEA. On December 4, EFF had received no word from the state regarding an enforcement action based on these new allegations. Under RCW 42-.17.400(4), EFF sent the AG a second letter on December 4, giving notice that EFF would file a citizen's action within 10 days if the state took no action within that time.

On December 12, the AG sent EFF a letter explaining that it had referred EFF's allegations to the PDC. The letter stated that the PDC would file administrative charges against the WEA or NEA based on the $410,000 funds transfer.[6] The AG explained that because the PDC had taken an administrative action based on EFF's allegations, the AG would not file a lawsuit based on those allegations. The AG also notified EFF that it could not include these allegations in a citizen's lawsuit because of the PDC's administrative enforcement actions.

On December 17, EFF filed this lawsuit in the superior court on the initial issues that the PDC and the AG had declined to act on.[7] EFF complained that WEA and its affiliate organizations[8] were political committees as defined by the Act and should have made appropriate financial disclosures. EFF also alleged that Kristeen Hanselman, an NEA employee, had underreported her in-kind services to the No Committee. EFF asked for declarative and injunctive relief and civil penalties on behalf of the state.

On January 2, 1998, EFF moved to amend its complaint to include allegations about the $410,000 funds transfer from NEA to WEA. The trial court denied EFF's motion because the PDC had acted on those allegations. The trial

---

[6] The letter also states that the PDC had taken action against NEA, WEA, and Seibert in response to allegations unrelated to the allegations of concern here. *See* n.3, *supra*.

[7] *See* n.3, *supra*.

[8] These include the NEA, regional groups within the state (called UniServ Councils) and local education associations.

court reasoned that considering these allegations would violate the priority of action rule.

EFF demanded a jury trial. WEA moved to strike the jury demand. The trial court granted WEA's motion, concluding that the action was not one for which the right of trial by jury is reserved.

The 16-day-long bench trial included testimony of approximately 50 witnesses and 750 exhibits. After trial, the court issued a written decision and made extensive findings of fact and conclusions of law, including detailed findings of WEA's activities preceding and during the 1996 election cycle. The trial court concluded that WEA was not a political committee. The trial court also found that Kristeen Hanselman did not violate the Act by underreporting her hours. The trial court awarded Hanselman costs and attorney fees, but it denied costs and attorney fees to WEA.

EFF appeals and WEA cross-appeals.

## ANALYSIS

### I. EFF's Appeal

#### A. Standard of Review

■ ■ EFF first contends that WEA was a political committee. Whether WEA was a political committee is a mixed question of law and fact. There are disputes both as to the inferences drawn from the facts and the meaning of "political committee" as a statutory phrase. *See Korte v. Employment Sec. Dep't*, 47 Wn. App. 296, 300, 734 P.2d 939 (1987). We review mixed questions of law and fact under the error of law standard, giving deference to the trial court's factual findings, but reviewing their application to the law de novo. *Wright v. Mead Sch. Dist. No. 354*, 87 Wn. App. 624, 628, 944 P.2d 1 (1997), *review denied*, 134 Wn.2d 1011 (1998); *Korte*, 47 Wn. App. at 300.

■ EFF also challenges whether the trial court's findings of fact regarding "contributions," "expenditures," and

"disclosures"[9] are findings of fact or conclusions of law. The trial court's label of a finding as one of fact is not determinative. *Para-Medical Leasing, Inc. v. Hangen*, 48 Wn. App. 389, 397, 739 P.2d 717, *review denied*, 109 Wn.2d 1003 (1987).

Here, the definitions of "contribution" and "expenditure" depend on the definition of "political committee." The statutory definition of "contribution" includes, in relevant part, a "transfer of funds between *political committees*." RCW 42.17.020(14)(a)(i) (emphasis added). The definition of "expenditure" includes, in relevant part, "a payment, *contribution*, subscription, distribution, loan, advance, deposit, or gift." RCW 42.17.020(19) (emphasis added). Therefore, when the definition of "political committee" is resolved, no other aspects of the definitions of "contribution" or "expenditure" remain unclear for the purposes of resolving the issues before us.

■■ Accordingly, after we decide the above definitional issues, EFF's second and third assignments of error[10] will be subject to de novo review because they involve whether certain uncontested facts establish "contributions." EFF's assignments of error four through seven[11] involve the definition of "political committee," which makes them questions of law also subject to de novo review, as discussed above. EFF's assignments of error 8 through 11[12] involve separate issues of law and are subject to de novo review.

---

[9] EFF also argues that findings regarding "disclosure" are legal conclusions, but the statute does not define this term. *See* RCW 42.17.020.

[10] EFF's second and third assignments of error involve whether the $410,000 transferred from NEA to WEA, and then to the No Committee, was a "contribution" under the Act.

[11] In its fourth through seventh assignments of error, EFF claims the trial court erred in concluding that WEA was not a political committee as a receiver of contributions, in making a means/ends distinction when determining primary purpose, in applying a percentage of expenditures test when determining primary purpose, and in concluding that WEA was not a political committee as a maker of expenditures.

[12] In its 8th through 11th assignments of error, EFF claims the trial court erred in concluding the purposes of the Act had been fulfilled, in refusing to allow EFF to amend its complaint to include new charges, in striking EFF's jury demand, and in awarding attorney fees to Kristeen Hanselman and NEA.

## B. Definition of Political Committee

EFF argues that the trial court erred in concluding that WEA was not a political committee during the 1996 election cycle. Specifically, EFF challenges the definition of political committee and the methodology the trial court used to determine whether WEA met that definition.

This is the central issue. A finding that WEA was a political committee would require WEA to file detailed reports to the PDC of all bank accounts, all deposits and donations, and all expenditures, including the names of each person contributing funds. RCW 42.17.060(2), .080, .020(14)(a)(i), (19). All funds would have to be reported, even those used for traditional labor union activities not connected with electoral campaign activity, such as collective bargaining, member representation, and other teacher assistance.

■ The Act sets forth two alternative prongs under which an individual or organization may become a political committee and subject to the Act's reporting requirements. " 'Political committee' means any person . . . having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition." RCW 42.17.020(33). Thus, a person or organization may become a political committee by either (1) expecting to receive or receiving contributions, or (2) expecting to make or making expenditures to further electoral political goals.[13]

### 1. Maker of Expenditures

In the only Washington Supreme Court case to interpret the statutory definition of "political committee," the Court added a new requirement to the "making of expenditures" prong. *State v. Dan J. Evans Campaign Comm.*, 86 Wn.2d

---

[13] We use the phrases "electoral political goals" and "electoral political activity" to convey the statutory language "support of, or opposition to, any candidate or any ballot proposition" from RCW 42.17.020(33).

503, 509, 546 P.2d 75 (1976). The organization making expenditures must have as its "primary or one of the primary purposes . . . to affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions." *Evans*, 86 Wn.2d at 509 (emphasis omitted).

The trial court here adopted the broad standard "*one of the* primary purposes" and applied it in formulating its own rule: An organization is a political committee if one of its primary purposes is to affect governmental decision making by supporting or opposing candidates or ballot propositions, and it makes or expects to make contributions in support of or in opposition to a candidate or ballot measure.

We begin our analysis by noting that the trial court correctly formulated this rule. First, as the only mandatory authority on this issue, *Evans* controls interpretations of the "maker of expenditures" prong. Second, the declaration of policy at the beginning of the Act states that its provisions are to be liberally construed "to promote complete disclosure of . . . political campaigns." RCW 42.17.010(11).

### The standard for determining "primary purpose"

■■ EFF challenges the trial court's method for determining whether electoral political activity is one of WEA's primary purposes. Specifically, EFF argues that the trial court's means/ends analysis is faulty because it ignores that all "political" organizations are able to articulate goals that do not identify immediate political objectives.

To give guidance to the courts in this case of first impression, we hold that an appropriate framework for determining whether electoral political activity is one of an organization's primary purposes should include an examination of the stated goals and mission of the organization and whether electoral political activity was a primary means of achieving the stated goals and mission during the period in question.

Under this analysis, a nonexclusive list of analytical tools a court may use when evaluating the evidence includes: (1) the content of the stated goals and mission of the organization; (2) whether the organization's actions further its stated goals and mission; (3) whether the stated goals and mission of the organization would be substantially achieved by a favorable outcome in an upcoming election; and (4) whether the organization uses means other than electoral political activity to achieve its stated goals and mission.

This analysis avoids the means/end formula against which EFF argues. For example, if the organization has merely restated its primary political purpose in broad nonpolitical terms, the organization's purpose will likely be achieved in an upcoming election. But if electoral political activity is merely one means the organization uses to achieve its legitimate broad nonpolitical goals, electoral political activity cannot be said to be one of the organization's primary purposes.

But this analysis should not be applied as a formula. These are analytical tools meant to guide the court's determination of the equitable issues presented. They are intended to reach all relevant evidence, but they are not exclusive. For example, by examining the totality of the circumstances, a fact finder may look at all of the organization's actions, including those in addition to its stated goals. If the activities of an organization reveal that a majority of its efforts are put toward electoral political activity, the fact finder may disregard the organization's stated goals to the contrary.

If, after making these considerations, the fact finder determines that, on the whole, the evidence indicates that one of the organization's primary purposes was electoral political activity during the period in question, and the organization received political contributions as defined in the Act, then the organization was a political committee for that period and should comply with the appropriate disclosure requirements.

This is similar to the analysis the trial court completed.[14] The trial court considered the WEA's goals, core values, pronouncements, and the implementation of those pronouncements. The trial court found that WEA's "purpose [was] to enhance the economic and professional security of its members." Clerk's Papers (CP) at 995. WEA accomplishes this not only by conducting contract negotiations and strikes, but also by legislative lobbying and electoral political activity when its members' economic security is implicated.

EFF, as well as the Education Excellence Coalition (EEC) as an amicus curiae, argue that the trial court's decision violates the Equal Protection Clause because it considers the percentage of WEA's expenditures on electoral political activity. EFF and EEC argue that a small percentage of a large organization's budget spent on electoral political activity may be more than a small political committee's entire budget. Such a consideration, they argue, impermissibly favors large organizations because a small political organization would be subject to disclosure under the Act, while the large organization would be able to outspend the smaller one without being subject to disclosure.

Although we acknowledge this argument, we note that the trial court's decision did not rely on this factor, and our analysis does not include it. We affirm the trial court's analysis exclusive of an analysis of percentage of expenditures.

Finally, the trial court balanced the policy objectives stated in the Act and by our Supreme Court in *Evans*. It recognized the Act's stated purpose that full disclosure is the goal and secrecy is to be avoided. CP at 979 (citing RCW 42.17.010(1)). The trial court also, however, noted a caveat from *Evans*: The definition of political committee was not meant to indiscriminately include all those who seek to influence government by their support or opposition to

---

[14] We agree with the trial court that it had little appellate court guidance. Nevertheless, the trial court engaged in a thoughtful and detailed analysis of a difficult issue.

candidates or ballot propositions. CP at 979 (quoting *Evans*, 86 Wn.2d at 507-08).

After comparing the trial court's findings and engaging in our analysis as set forth, we hold that under the uncontested facts of this case, WEA was not a political committee as a maker of expenditures.

## *2. Receiver of Contributions*

■ An organization can also become a political committee by "receiving contributions . . . in support of, or opposition to, any candidate or any ballot proposition." RCW 42.17.020(33). We also hold that WEA was not a political committee as a receiver of contributions.

Under the "receiver of contributions" prong, the trial court properly adopted the test from a 1973 Attorney General Letter Opinion: When an organization is funded primarily by membership dues, it is a "receiver of contributions" if the members are called upon to make payments that are segregated for political purposes and the members know, or reasonably should know, of this political use. CP at 1893 (1973 Letter Op. Att'y Gen. No. 114, at 4). Dues are political "contributions" if the organization's members intend or expect their dues to be used for electoral political activity.

In the 1973 Letter Opinion, the AG was asked whether a public employees' union was a political committee under the receiver of contributions prong when its funds were primarily gathered through dues. The Letter Opinion states that if the only source of revenue of the organization is dues or assessments to fund general operations, and the membership has no actual or constructive knowledge that the organization is setting aside funds to support or oppose a candidate or ballot proposition, then the organization is not a political committee under the "receiver of contributions" prong. 1973 Letter Op. Att'y Gen. No. 114, at 4.

But if the membership makes payments that are segregated into a fund for political purposes and the membership knows or should know of this segregation, those payments

are "contributions" and the organization is a political committee under the "receiver of contributions" prong. 1973 Letter Op. Att'y Gen. No. 114, at 4-5.

The Letter Opinion applied this standard to the Washington State Councils of Police Officers and Fire Fighters. 1973 Letter Op. Att'y Gen. No. 114, at 5 (1973). The AG opined that a court would not find these two organizations to be political committees because the dues they receive are not separated into political funds. 1973 Letter Op. Att'y Gen. No. 114, at 5. On the other hand, the Letter Opinion states that a court may find that the Seattle Fire Fighters' Union Local No. 27 was a political committee because it received monies that were meant for political campaign expenditures. Because the bylaws so specify, the membership is deemed to have knowledge that part of the money was to be spent on political activity. Such money is then a "contribution" and its receipt by the union probably qualifies the union as a political committee. 1973 Letter Op. Att'y Gen. No. 114, at 5.

We adopt the above reasoning. Here, the WEA members paid dues into the WEA general fund, which was not segregated in any manner for political expenditures.[15] The members, therefore, would have had no actual or constructive knowledge that their membership dues would be used for electoral political activity. Thus, those dues were not "contributions" as defined under the Act. WEA was not a political committee as a receiver of contributions.

### C. EFF's Motion to Amend Its Complaint

EFF further argues that WEA is a political committee as a receiver of contributions because WEA received a large contribution from NEA, which WEA then contributed to the No Committee. EFF asserts that the trial court erred when it did not allow EFF to amend its complaint to include allegations that a $410,000 transfer of funds from the NEA to the WEA was a political contribution.

---

[15] EFF does not challenge this finding of fact (FOF 12) and it is a verity on appeal. *See State v. Avila*, 102 Wn. App. 882, 896, 10 P.3d 486 (2000), *review denied*, 143 Wn.2d 1009 (2001).

In October 1997, EFF learned that WEA had received $410,000 from NEA in order to assist it in defeating I-173/177. EFF believed this violated the Act.[16] EFF moved to amend its complaint to include these new allegations.

Under RCW 42.17.400(4), a private person may bring a lawsuit in the name of the state (a citizen's action) for violations of the Act only if three conditions are met. First, the person must give notice to the AG and the prosecuting attorney that there is reason to believe that some provision of the Act is being or has been violated. Second, if 45 days after this first notice the prosecuting attorney and AG have not commenced an action, the person must file a second notice with the AG and prosecuting attorney notifying them that the person will commence a citizen's action within 10 days of this second notice if neither the prosecutor nor the AG acts. Finally, the AG and the prosecuting attorney must fail to bring such an action within 10 days of receiving the second notice.

On October 1, 1997, EFF sent a first notice to the AG requesting that the state file a lawsuit against WEA because of the funds transferred from NEA to WEA. On December 4, EFF had received no word from the state regarding an enforcement action based on these new allegations. Under RCW 42.17.400(4), EFF sent the AG the second letter on December 4, giving notice that EFF would file a citizen's action within 10 days if the state took no action within that time.

On December 12, the AG sent EFF a letter explaining that it had referred EFF's allegations to the PDC, the administrative body charged jointly with the AG with enforcing the Act. The letter explained that the PDC would file administrative charges against the WEA or NEA based on the $410,000 transfer of funds.[17] The AG explained that because the PDC had taken administrative action based on EFF's allegations, the AG would not file a lawsuit based on

[16] *See* n.5, *supra.*

[17] *See* nn.3, 6, *supra.*

these allegations. The AG notified EFF that it could not file a citizen's lawsuit because the PDC had started administrative enforcement actions based on EFF's allegations.

Nevertheless, EFF moved to amend its complaint in the superior court to include allegations about the $410,000 funds transfer. The trial court denied EFF's motion based on the priority of action rule. EFF argues that action by the PDC does not preclude a citizen's action under RCW 42.17.400(4) because (1) EFF met the statutory requirements for a citizen's lawsuit, and (2) the priority of action rule does not apply because there is not an identity of remedies available at the trial court and administrative level.

## 1. Standard of Review

Although we generally review a trial court's decision not to allow a party to amend its complaint for an abuse of discretion, when the ruling is based on the court's determination of the law, we review it de novo. *Wilson v. Horsley*, 137 Wn.2d 500, 505, 974 P.2d 316 (1999) (denial of a motion to amend a complaint is reviewed for an abuse of discretion); *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993) ("A trial court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law."). Because the trial court's decision not to allow EFF to amend its complaint was based on the priority of action legal doctrine, we review its ruling de novo.

## 2. Language of the Act

EFF argues that under the language of the Act, the trial court erred in not allowing EFF to amend its complaint because neither the prosecutor nor the AG acted on EFF's allegations. Rather, the PDC, the administrative agency charged with joint primary enforcement of the Act, commenced an action against WEA based on EFF's allegations.

■ As stated, RCW 42.17.400(4) allows a citizen's lawsuit to enforce alleged violations of the Act only if three conditions set out above are met. Although it is true that RCW 42.17.400(4) does not specifically refer to an action by the PDC, other parts of the statute do. RCW 42.17.395(1) grants the PDC authority to determine whether violations of the Act have occurred and to issue and to enforce appropriate orders. RCW 42.17.400(2) states that the AG or prosecuting attorney "may investigate or cause to be investigated" alleged violations of the Act.

Here, before the 10-day period had passed after EFF's second letter to the AG, the AG forwarded the allegations to the PDC for investigation. This was appropriate action for the AG to take and it tolls the 10-day deadline. Further, the AG deferred to the charges that the PDC filed as appropriate under RCW 42.17.400(1) and RCW 42.17.395. Because the AG acted before the end of the 10-day period, EFF could not bring a citizen's lawsuit under RCW 42.17.400(4) and the trial court properly denied EFF's motion to amend its pleadings.

## D. The Priority of Action Doctrine

EFF also argues that the PDC's actions did not toll the 10-day period because the relief available to the PDC is not identical to the relief available to the trial court. Therefore, EFF asserts that, absent res judicata between the PDC's ruling and the trial court, the priority of action doctrine does not apply.

■ Under the priority of action doctrine, the forum that first gains jurisdiction over a matter retains exclusive authority over it. *City of Yakima v. Int'l Ass'n of Fire Fighters, Local 469*, 117 Wn.2d 655, 675, 818 P.2d 1076 (1991) (quoting *Sherwin v. Arveson*, 96 Wn.2d 77, 80, 633 P.2d 1335 (1981)). This doctrine applies to administrative agencies and the courts. *Int'l Ass'n of Fire Fighters*, 117 Wn.2d at 675 (superior court erred in assuming jurisdiction of a case already proceeding before the Public Employees

Relation Commission). The doctrine applies only if the two cases at issue involve identical (1) subject matter, (2) parties, and (3) relief. *Int'l Ass'n of Fire Fighters*, 117 Wn.2d at 675. The identity of these elements must be such that a decision in one tribunal would bar proceedings in the other tribunal because of res judicata. *Int'l Ass'n of Fire Fighters*, 117 Wn.2d at 675.

It is undisputed that the first two elements of the doctrine, identical subject matter and parties, exist. EFF argues, however, that the third element, identity of relief, is not met because the PDC can levy fines only up to $2,500, but the court can levy fines far in excess of that amount. RCW 42.17.395(4), .390(5). This is a disparity of relief, argues EFF, so the doctrine should not apply.

But this disparity does not preclude us from determining that the third element has been met and applying the priority of action doctrine here. First, the type of relief available to both the PDC and the court is the same. RCW 42.17.395(4). Second, if the PDC believed the matter before it would not be remedied by the penalty available to it, the PDC could have referred the matter to the AG for a lawsuit in superior court. RCW 42.17.395(3). And third, the policy behind the priority of action doctrine, the ability to apply res judicata to a later action in superior court, relates here. *See Int'l Ass'n of Fire Fighters*, 117 Wn.2d at 675. Res judicata precludes a later lawsuit when the second lawsuit has identical subject matter, cause of action, persons and parties, and the quality of the persons for or against whom the claim is made. *Rains v. State*, 100 Wn.2d 660, 663, 674 P.2d 165 (1983).

Here, these four elements of res judicata are met. The subject matter of the claim EFF wanted to assert was identical to that of the PDC's administrative case. The defendants, WEA and NEA, were also identical in both actions. The state was the charging party in both cases: the PDC as the agency charged by statute to enforce the Act in the administrative case, and EFF is in the shoes of the state in the superior court case. Because both parties would sue

in the name of the state, the quality of the person making the claim would be the same in both cases. *Rains,* 100 Wn.2d at 664 (identity of the parties is a matter of substance, not form).

■■■ EFF argues that the disparity in the amounts the PDC and the superior court are able to enforce precludes applying res judicata. In support of this, EFF cites selections from the *Restatement (Second) of Judgments,* stating that preclusion is inapplicable for a claim when the plaintiff was unable to seek "certain remedy or form of relief in the first action because of the limitations on the competency of the [tribunal]. . . ." RESTATEMENT (SECOND) OF JUDGMENTS § 83 cmt. g (1982). EFF's reliance on this comment is misplaced.

Language elsewhere within the same comment clarifies this quotation and indicates that it applies to a different problem: because administrative agencies are typically limited in the substantive claims they can adjudicate, a party may have substantive legal claims arising from the same transaction that the agency cannot hear. RESTATEMENT (SECOND) OF JUDGMENTS § 83 cmt. g (1982). Because the agencies are institutionally incompetent to hear all claims, a party should not be precluded from bringing a lawsuit in a court of general jurisdiction for a hearing of claims excluded at the agency level. RESTATEMENT (SECOND) OF JUDGMENTS § 83 cmt. g (1982). This is not the issue here; the PDC is competent to adjudicate the issue EFF brought.

Nor is the form of relief at issue in this case. As mentioned, the form of relief before both the PDC and the superior court is a fine. Although the amount of the fines may be different, the form of relief is the same.

■■■ Finally, the policies behind a citizen's lawsuit provision in the Act and the priority of action doctrine are complementary. The citizen's lawsuit provision seeks to give private citizens, such as EFF, the right to enforce the Act only if the state has not acted. The priority of action doctrine seeks to allow the first forum to retain jurisdiction over a claim to preclude other forums from asserting

jurisdiction. Therefore, because the PDC had acted, EFF could not invoke the citizen's lawsuit provision.

This is also consistent with the proper broad policy concerns the trial court articulated in its oral ruling. If EFF were allowed to amend its complaint to bring the same claim in superior court that the PDC was pursuing administratively, the effect would be to "permit the individual watchdog to file an individual action in superior court after the PDC considered the matter and decided to handle it administratively, . . . tak[ing] that discretion away from the PDC." 1 Report of Proceedings at 42. Thus, every watchdog group would be able to demand that the PDC find the watchdog's allegations meritorious or the watchdog could sue in superior court.

The trial court properly denied EFF's motion to amend its complaint. Therefore, we do not address EFF's allegations about the NEA funds transfer because the issue is not before us.

### E. EFF's Right to a Jury Trial

■■ ■■ EFF next contends that the trial court erred when it denied EFF's jury demand. Our state constitution preserves the right to a trial by jury. WASH. CONST. art. I, § 21. But this right is not absolute for civil causes of action. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 644, 771 P.2d 711, 780 P.2d 260 (1989). If there is no statute granting a jury trial, Washington courts examine the nature of the cause of action to see if it is analogous to a common law cause of action entitled to a jury trial when the constitution was adopted in 1889. *Sofie*, 112 Wn.2d at 648-49. Parties bringing equitable actions are not entitled to a jury. *State v. State Credit Ass'n*, 33 Wn. App. 617, 621, 657 P.2d 327 (1983), *rev'd on other grounds*, 102 Wn.2d 1022 (1984).

■■ In *Sofie*, our Supreme Court recognized that, although the United States Supreme Court precedent on the right to a civil jury trial under the Seventh Amendment was not binding on state courts, it may be used as an analytical

example. *Sofie*, 112 Wn.2d at 649. Our Supreme Court then cited one such federal case, *Tull v. United States*, 481 U.S. 412, 107 S. Ct. 1831, 95 L. Ed. 2d 365 (1987). *Sofie*, 112 Wn.2d at 649. The Court noted that *Tull* used a historical analysis to determine whether a new cause of action was analogous to one that was entitled to a jury trial at common law. *Sofie*, 112 Wn.2d at 649. The Court then held that recent tort theories could be analogized to common-law tort theories that existed when our state constitution was adopted in 1889. *Sofie*, 112 Wn.2d at 649.

EFF asks us to adopt not only the *Tull* methodology of historical analysis, but also the particular analogy the United States Supreme Court used. In *Tull*, the Court analogized a judgment for a violation of the Clean Water Act to an 18th century action in debt, for which federal courts had granted a jury trial under the Seventh Amendment. *Tull*, 481 U.S. at 420. Here, EFF argues that because EFF, acting for the state, also seeks civil penalties under statutory provisions, this action should also been seen as an action in debt and, thus, requires a jury trial. But as the trial court correctly noted, EFF's reliance on *Tull* for this proposition is misplaced.

First, our Supreme Court emphasized that it reached its result on independent state grounds and that *Tull* did not compel its result. *Sofie*, 112 Wn.2d at 649. The court did not adopt the *Tull* holding in its entirety. *Sofie*, 112 Wn.2d at 649. Although the court adopted the method of historical analogy from *Tull*, it specifically refused to "stretch[] the analogy as far as the [United States] Supreme Court did." *Sofie*, 112 Wn.2d at 649. In *Sofie*, the court held only that recent tort theories are analogous to the common law tort actions in existence in 1889. *Sofie*, 112 Wn.2d at 649.

Second, as the trial court correctly ruled, Washington courts have recognized that some recent causes of action have no historical analogues. For example, *State Credit Ass'n* recognized that consumer protection actions had no parallel in the law when the constitution was adopted in 1889. *State Credit Ass'n*, 33 Wn. App. at 621. In that case,

the court held that the Consumer Protection Act's concept of "unfair or deceptive acts or practices" or "unfair methods of competition" have no exact common law equivalent. *State Credit Ass'n*, 33 Wn. App. at 621.

Similar to *State Credit Ass'n*, there is not an historical analogue from 1889 to the cause of action for violation of campaign finance regulation.[18] Therefore, we are not compelled to hold that the cause of action in this case necessarily fits within an historically recognized cause of action.

Nevertheless, even if we were to decide that the present case has an analogue from 1889, it would be one analogous to an action in equity. Here, the trial court properly considered the factors identified in *Brown v. Safeway Stores, Inc.* for when a lawsuit is primarily equitable and, thus, not subject to a jury trial. *Brown*, 94 Wn.2d 359, 368, 617 P.2d 704 (1980). The factors are: (1) who seeks equitable relief; (2) if the person seeking the relief is demanding a jury trial; (3) whether the main issues are primarily legal or equitable; (4) whether the equitable issues present complexities that would affect the orderly determination of such issues by jury; and (5) whether the equitable and legal issues are easily separable. (6) The court should give great weight to the constitutional right to a jury when exercising its discretion and (7) should go beyond the pleadings to ascertain the real issue in dispute. *Brown*, 94 Wn.2d at 368.

The trial court correctly determined that the primary issues in the case were equitable ones brought by EFF. EFF's amended complaint states six prayers for relief that are primarily equitable. Injunctive relief is an equitable remedy. *State Credit Ass'n*, 33 Wn. App. at 621. Restitution

[18] EFF argues that because *Sofie* was decided after *State Credit Ass'n*, *Sofie*'s broad analogous approach to the historical analysis overrules *State Credit Ass'n*'s more narrow approach of an "exact common law equivalent." *Sofie*, 112 Wn.2d at 649; *State Credit Ass'n*, 33 Wn. App. at 621. Yet although the *Sofie* court's method allows an analogy rather than an exact equivalent, *Sofie* did not specifically overrule *State Credit Ass'n*. Further, EFF neglects to recognize that although *Sofie* takes an analogous approach, it specifically rejected the *Tull* court's analogy as too broad. *Sofie*, 112 Wn.2d at 649.

or civil penalties are incidental to the injunctive relief when the two are combined. *State Credit Ass'n*, 33 Wn. App. at 621. EFF's first prayer is really three separate prayers for declaratory injunctions that the WEA, COP (Community Outreach Program), and UniServ Councils are political committees and required to comply with the Act's reporting requirements. The second prayer for relief is for an injunction requiring WEA, COP, and UniServ Councils to report as political committees. The third, fourth, fifth, and sixth prayers are for civil penalties, additional injunctive relief and for costs and attorney fees. EFF's request for penalties is incidental to the injunctive relief requested. Even when examined beyond the pleadings, the nature of the lawsuit was primarily equitable. The trial court further determined that the issues were of such complexity that they should be tried to a court.

Finally, the court offered to consider motions to bifurcate the legal and equitable claims. EFF made no such motion.

Because EFF's prayers for relief are equitable in nature, the penalties are incidental to the equitable claims, the trial court did not err in denying EFF's request for a jury trial.

### F. The Public's Right to Know

EFF further contends that the trial court erred in deciding that the public's right to know of all reportable contributions had been satisfied. More specifically, EFF asserts that (1) the trial court's finding on this matter is a conclusion of law subject to de novo review and (2) the trial court's "vast majority" standard is insufficient.[19] Specifically, EFF argues that WEA made unreported expenditures and hid the source of $410,000 it received from the NEA.

██ ██ Contrary to EFF's assertion, this issue is a mixed question of law and fact, which we review under the

---

[19] The trial court found that: "The public's right to know reportable campaign contributions has been satisfied inasmuch as the vast majority of these amounts were reported to the PDC as cash and in-kind contributions received by the No on 173/177 Committee." CP at 1891 (finding of fact 46).

error of law standard, giving deference to the factual findings, but reviewing their application to the law de novo. *Wright*, 87 Wn. App. at 628; *Korte*, 47 Wn. App. at 300. We review findings of fact to see if substantial evidence supports them. If it does, even if there is contradicting evidence, we uphold the findings of fact. *Org. to Pres. Agric. Lands v. Adams County*, 128 Wn.2d 869, 882, 913 P.2d 793 (1996).

 The Act says in its declaration of policy "[t]hat political campaign and lobbying contributions and expenditures [are to] be fully disclosed to the public and that secrecy is to be avoided." RCW 42.17.010(1). It further states that the Act "shall be liberally construed to promote complete disclosure of all information respecting the financing of political campaigns and lobbying." RCW 42.17.010.[20]

Because the Act indicates a preference for full disclosure, the trial court may have erred in applying a test that requires only the "vast majority" of amounts to be reported for the public's right to know to be satisfied. But an incorrect application of law is harmless when it is trivial, or formal, or merely an academic error, and when a reasonable person would determine that the error did not affect the outcome of the case. *See City of Bellevue v. Lorang*, 140 Wn.2d 19, 32, 992 P.2d 496 (2000) (quoting *State v. Smith*, 131 Wn.2d 258, 263-64, 930 P.2d 917 (1997) (quoting *State v. Wanrow*, 88 Wn.2d 221, 237, 559 P.2d 548 (1977))); *see also* Dennis J. Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process*, 31 Gonz. L. Rev. 277 (1995/96).

The trial court found that WEA's allocated political expenditures totaled $548,444. This amount included contributions to the No Committee, the salaries of employees assigned to work on the anti-initiative campaign, travel expenses, and the cost of a poll WEA paid for, which gave

---

[20] It is worth noting that the Act's statement of purpose ends with this proviso: "In promoting such complete disclosure, however, this chapter shall be enforced so as to insure that the information disclosed will not be misused for arbitrary and capricious purposes and to insure that all persons reporting under this chapter will be protected from harassment. . . ." RCW 42.17.010.

the results to the No Committee. EFF does not dispute this finding.

The trial court further found that an additional amount must be added for the salaries of those who spent only some of their time on the anti-initiative campaign. The court relied on Laird Vanetta, an independent certified public accountant who contracts to do work for the WEA, for the calculation of those figures. The trial court found that Vanetta's methods were reliable. On appeal, EFF does not dispute Vanetta's reliability (and in fact, relies on Vanetta's figures for its own calculations).

We affirm this finding because there is substantial evidence that the accounting methods and numbers that reach the $147,717 amount are reliable, which EFF does not dispute on appeal.[21] Finally, the $410,000 from the NEA was accounted for in the settlement agreement of February 26, 1998. *See supra* n.3.

Therefore, even assuming, without so holding, that the trial court erred in utilizing the "vast majority" standard, it was harmless because the facts indicate that under an even stricter standard, all monies expended for political purposes were reported or brought to the PDC's attention. The trial court correctly determined that the public's right to know has been satisfied.

## G. Attorney Fees

Finally, EFF argues that the trial court erred in awarding attorney fees to Kristeen Hanselman. EFF contends that the trial court improperly awarded fees on a single claim in the larger suit and improperly interpreted and applied the

---

[21] EFF challenged Vanetta's methods and conclusions at trial during his cross-examination and by calling its own accountant, Irving Ross. Yet, as previously noted, the trial court found Vanetta's opinions reasonable, credible, and based on general accounting principles. Furthermore, also as previously noted, EFF does not argue against Vanetta's conclusions on appeal and relies on them itself.

standard for awarding fees under the Act. WEA cross-appeals, requesting attorney fees on all claims.[22]

██ ██ In Washington, a litigant is generally not entitled to attorney fees unless authorized by contract, statute, or on a recognized ground in equity. *Barnett v. Buchan Baking Co.*, 108 Wn.2d 405, 408, 738 P.2d 1056 (1987). The Act provides that a trial court may award a respondent costs of trial and reasonable attorney fees only when a citizen's *action* under the Act is dismissed and when the court finds that the action was brought without reasonable cause. RCW 42.17.400(4).[23] We review an award of attorney fees for an abuse of discretion. *State ex rel. Quick-Ruben v. Verharen*, 136 Wn.2d 888, 903, 969 P.2d 64 (1998).

Here, the trial court did not base its attorney fees award on the entire lawsuit, but instead it considered the claims against Hanselman separately. The trial court did not find that the entire lawsuit was brought without reasonable cause; rather it found only that the claims against Hanselman were brought without reasonable cause.

 Whether "action," as used in the Act for attorney fee provision for a citizen's action, refers to an entire lawsuit or a single claim is an issue of first impression. Our Supreme Court, however, has held that the purpose of the Act's provision for attorney fees in a citizen's lawsuit was to prevent frivolous and harassing lawsuits. *Fritz v. Gorton*, 83 Wn.2d 275, 314, 517 P.2d 911 (1974) (holding this to be a basis for finding the citizen's lawsuit provision of the Act constitutional). The policy of discouraging frivolous citizen actions is furthered more by awarding attorney fees to individual claims brought without reasonable cause than by allowing frivolous claims to enjoy the safe haven of meritorious ones.

---

[22] We address WEA's cross-appeal in section II *infra*.

[23] "[I]n the case of a citizen's action which is dismissed and which the court also finds was brought without reasonable cause, the court may order the person commencing the action to pay all costs of trial and reasonable attorney's fees incurred by the defendant." RCW 42.17.400(4).

EFF also argues that the trial court abused its discretion when it lowered the standard for determining whether the claim against Hanselman was brought without reasonable cause. EFF further contends that it brought the claim against Hanselman with reasonable cause.

■ We hold that regardless of the standard applied, the trial court did not abuse its discretion in awarding attorney fees to Hanselman. EFF bases its argument on the fact that the trial court allowed this claim to survive summary judgment and argues that the issue is one of first impression. But the trial court ruled that the claim against Hanselman failed for lack of proof, and presented no undetermined issue of law or matter of public interest. Because the record supports these rulings, the trial court did not abuse its discretion. The trial court properly awarded attorney fees.

## II. WEA's Cross-Appeal

■ WEA argues in its cross-appeal that the Act is unconstitutional because it regulates issue advocacy without a compelling state interest to justify the regulation. Because we hold that WEA was not a political committee during the 1996 November election cycle, we do not address WEA's cross-appeal. *State v. Smith*, 104 Wn.2d 497, 505, 707 P.2d 1306 (1985) ("A court will not reach a constitutional issue if it can decide the case on nonconstitutional grounds.").

For the same reasons as applied against EFF, separate claims within a greater lawsuit may or may not be awarded attorney fees. The trial court did not abuse its discretion in denying attorney fees to WEA on the other claims. Therefore, we affirm the denial of fees and costs to WEA and deny them on appeal.

Affirmed.

HUNT, C.J., and ARMSTRONG, J., concur.

Reconsideration denied June 14, 2002.